Opinion issued July 8, 2003











In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-00-00133-CR

____________


DONALD C. HEIDELBERG, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 228th District Court

Harris County, Texas

Trial Court Cause No. 804016






DISSENTING OPINION ON MOTION FOR REHEARING

 I respectfully dissent. I would hold that appellant preserved error in his points
one, two, and four, all concerning his right to post-arrest silence.


Preliminary Statement

 I believe that the majority's summary of facts and jury argument is overly
condensed and omits vast portions of the record that bear on how the jury would
evaluate the critical issue of credibility of the complainant and appellant. Therefore,
I submit the following as an examination of "the entire record in a neutral, impartial
and even-handed manner." Barnum v. State, 7 S.W.3d 782, 793 (Tex.
App.--Amarillo 1999, pet. ref'd) (citing Harris v. State, 790 S.W.2d 568, 586 (Tex.
Crim. App. 1989)).

Facts

 In December 1998, the eight-year-old complainant, whose parents were
divorced, lived with her father, Derek, his then fiancée, Rae Jean, and Rae Jean's two
children. The complainant spent Christmas evening and December 26 with her
mother, Shannon, at Shannon's one-bedroom apartment. Shannon's mother, Vernee,
and appellant, Shannon's 47-year-old step-father, lived in the same apartment
complex and frequently baby sat the complainant and Vernee's other grandchildren. 
On December 26, Shannon went out late at night and left the complainant in her
apartment in the care of Vernee and appellant, as she had done on many occasions. 
Vernee and appellant testified that they watched television with the complainant in
the living room until about 10 p.m., when the complainant went into the bedroom to
go to sleep. The complainant testified that she did not watch television with the two
adults before going to bed. Shannon testified that she did not go out until after 11
p.m., after she put the complainant to bed. Vernee and appellant testified that they
continued to watch television until they went to sleep in the living room.

The State's testimony--the complainant

 The complainant testified as follows. As she lay in bed in the bedroom,
pretending to be asleep, she heard appellant come from the living room through the
bedroom, go to the adjoining bathroom, relieve himself, and return through the
bedroom to the living room. Shortly afterward, while she still pretended to be asleep,
he returned to the bedroom a second time, closed the door to the living room, pulled
down her underwear, touched her genitals and anus with his hand, pulled her
underwear back up, and left the bedroom. He returned to the bedroom a third time,
fondled her private parts, and returned to the living room. He returned a fourth time,
and she heard him unzip and pull down his pants. She felt him press his penis against
her anus, and penetrate her "a little bit." She felt something wet. He got toilet paper
from the bathroom, wiped the complainant's private area, and returned to the living
room. Neither she nor appellant spoke during any of the four times he came into the
bedroom. The next morning, December 27, she told her mother, Shannon, only that
appellant had fondled her.

 Later that day, Shannon told her mother, Vernee, what the complainant had told
her, but did not confront appellant about it. Shannon returned the complainant to her
father's house that afternoon, where the complainant told the full account to Rae
Jean's 12-year-old daughter and then to Rae Jean. When the complainant's father,
Derek, returned home from work that night, Rae Jean told him and he telephoned the
police.

 On December 29, the complainant was taken to the Children's Assessment
Center, where she was examined by Dr. Margaret McNeese, the facility's director, a
pediatrician who specializes in the diagnosis and treatment of child abuse.

The State's testimony--Dr. NcNeese

 Dr. McNeese testified that under her questioning, the complainant said that
"[t]he reason I'm here is because of my paw-paw"; "that he touched me in spots
where he shouldn't have touched me," with "[h]is hand and penis" once; and that it
happened "Saturday night." Dr. McNeese testified that a rape kit examination of the
complainant was negative, which was reasonable to expect 48 to 72 hours after such
an event. Dr. McNeese examined the complainant and found, under magnification,
a decreased stellate pattern of skin folds in the complainant's rectal area, often seen
when a child is an unwilling participant in anal intercourse, and which usually
disappears within 72 hours.

The State's testimony--Rae Jean

 Rae Jean, the complainant's father's fiancée at the time, testified that she first
felt something was wrong when Shannon brought the complainant home on
December 27, but did not come inside to help the complainant get situated, as she had
always done before. Instead, Shannon simply came in, dropped off the complainant's
things, and left without talking to Rae Jean. Rae Jean first saw the complainant that
evening in Rae Jean's daughter's room, where the complainant's demeanor "was
unlike I had ever seen before . . . she was extremely upset . . . she was very scared,
she was crying . . . she was shaking. She was out of the norm."

 Rae Jean's account of what the complainant told her was consistent with the
complainant's earlier testimony of events, except that the complainant told her
nothing about appellant's orgasm or "anything wet happening around her when he
was done." Rae Jean testified that "the way she was, I knew from my gut, . . . that
child was not lying." Rae Jean told Derek, the complainant's father, of the
complainant's statement when he returned home that night, and he became "very
upset" and telephoned the police. Child Protective Services ("CPS") came and took
the complainant to the doctor on December 29.

 In Rae Jean's opinion, the complainant often did not tell her things that went
on at her mother's house because "she is afraid that her father would get angry and
not allow her to go over." The complainant is close to her mother, enjoys being with
her, and is "very protective of her mother." Shannon usually came for the
complainant "about once every two to three weeks," depending on her schedule and
whether she wanted the complainant or not. The complainant complained to Rae Jean
about being left with other people while she was visiting at her mother's apartment,
and told Rae Jean it upset her "because she went there to be with her mom and her
mom was not there." Derek disapproved of the complainant's grandmother Vernee's
lifestyle because "she did drugs and ran the streets."

State's testimony--Detective Fitzgerald

 Harris County Deputy Sheriff James P. Fitzgerald, a detective assigned to the
Children's Assessment Center, testified about the routine of checks and inquiries
conducted when CPS refers a complaint of a family-related sexual assault of a child
to the Assessment Center. The child is brought to the Center and questioned by a
specially trained forensic interviewer in a "nonleading" and "very innocuous"
manner. If the child mentions abuse, they "zoom in on that and work it." A statement
is taken from the victim, a medical exam is done at the clinic in the same building,
and other witnesses "who might have knowledge of the situation" are then
interviewed, including the suspect.

 Fitzgerald testified that, typically, the defendant is given an opportunity to
speak because the child "may be telling us a story," and "the defendant is the best
source of information as to why this child would be telling a lie about him, making
up a story." It is fairly common "that an offense occurs with someone in the next
room."

 On cross-examination, Fitzgerald testified that the original report the
Assessment Center received from CPS was of "a touching incident with no
penetration," that he therefore did not attempt to get the bed sheets to check for
semen, and that he believed, but was unsure (and thus did not put in his report), that
the sheets had been changed. He agreed with appellant's attorney that semen might
indeed be on the sheets if they had not been changed, and that evidence of semen, if
it had been found, would directly link someone to the offense.

The State's testimony--Shannon

 The State did not call Shannon, the complainant's mother, as a witness until the
State's rebuttal. She testified that several months after their divorce she asked Derek,
her former husband and the complainant's father, to take the complainant to live with
him because she, Shannon, was having "a lot of problems" with her mother, Vernee,
with whom she and the complainant were staying. On December 26, she made
arrangements at about 10 p.m. to go out, and left her apartment about midnight,
leaving the complainant with appellant and Vernee. There had never been any
problems between the complainant and appellant before, and the two had "a good
relationship." Shannon stated she put the complainant to bed before she left and that
the complainant was not watching television with the two adults when she left. When
Shannon returned, Vernee was asleep on the living room couch and appellant was
asleep on the living room floor. She went into the bedroom, and the complainant was
awake. When Shannon undressed and got into bed, the complainant said, "you know,
I have something to tell you." She said "what is it?" The trial court sustained
appellant's objection and prevented Shannon's response. (1) The next day, Shannon
testified, she observed a different, more subdued, manner that appellant and the
complainant showed toward each other, a manner that was so contrary to the usual
light-heartedness between them.



The Defense testimony--Vernee

 Vernee, the complainant's maternal grandmother, testified (1) that she was still
married to, but separated from, appellant and (2) that "we're friends right now," but
that she is dating someone else. Vernee also testified that since her marriage to
appellant in 1994, (1) appellant has baby sat the complainant and Vernee's other
grandchildren alone "plenty of times," (2) the complainant "has lied about things" and
"loves attention," (3) the complainant wants to live with Shannon, (4) the
complainant has become upset with Shannon on occasions for "going out while she
is [visiting at the apartment] with her," and (5) Shannon kept X-rated videos in the
apartment before the incident.

 Vernee testified that on the evening in question, she and appellant had one beer
apiece and shared a half cup of brandy, but neither was intoxicated. They came over
to Shannon's apartment on short notice to sit with the complainant when Shannon
decided late to go out. Before Shannon left, they watched, along with the
complainant, a television special on JonBenet Ramsey ("she was raped and molested,
or whatever, or strangled, you know. They found her in her mother's house in the
basement or wherever."). The complainant went to bed before Shannon left at about
11 p.m. Vernee and appellant continued to watch television after the complainant
went to the bedroom to go to sleep.

 Appellant went through the bedroom to the bathroom and was out of Vernee's
presence only "[a] minute, long enough to go to the bathroom and come back." 
Appellant went to sleep on the living room floor, and she slept on the living room
couch. Vernee is not a heavy sleeper, and she heard nothing going on. She does not
believe "what [the complainant] said happened really happened." Appellant fell
asleep before she did, and she continued to watch television. "I got up and went to
the bathroom several times myself and he was still laying there sleep [sic] snoring .
. . on the floor." Shannon came home between 3:30 and 4:00 a.m. Vernee was
present with the complainant and Shannon the next morning, and the complainant
never said anything in her presence about appellant; there was nothing unusual about
the complainant's demeanor. The complainant "never hesitates to tell anyone what's
on her mind," and she never told Vernee "anything was going on with her
grandfather." Shannon told Vernee about the allegations the next day. Vernee has
never spoken to the complainant about the event, but did speak with appellant and
told him words to the effect that "I don't know why this is being said or whatever
because I was right there, you know, the whole time . . . and as far as what I heard
was going on, there's no way none of that could have happened while I was standing
there."

 Vernee acknowledged that she had smoked marihuana in front of the
complainant, but denied that she had ever told Shannon, her daughter, to tell the
complainant not to testify. She testified that Shannon was molested as a child in
California by Shannon's own step-grandfather ("my mother's husband") and that
when she, Vernee, learned of it years later, she did not encourage Shannon then to go
to the police. She does not know whether the complainant knew of that incident of
molestation.

The Defense testimony--appellant

 Appellant emphatically denied the complainant's charges. He testified that he
never sexually abused or improperly touched "her or any other child. I'm not a child
abuser, I'm not a child molester. I'm not any kind of perverted person." He was
"shocked" and "upset" at the charges. He has known Shannon since 1993, and his
relationship with her was good before December 26, 1998. He said it was normal for
him to take care of Shannon's daughter, and he watched her for Shannon "quite
often." He had earlier continued to live with Shannon while he and Shannon's
mother, Vernee, were separated from May to September 1998.

 Appellant testified that after Shannon returned to the apartment early on
December 27, he and Vernee left about 4:30 or 5:00 a.m. and returned to their own
apartment. Everything was normal the next day, and Shannon did not ask him
anything about what the complainant might have said to her. He has no ill feelings
toward the complainant, and he understands "what [she] has been going through since
I've known her, the five or six years I've known her. For a child of her age, she has
gone through quite a bit, quite a bit."

 This concluded appellant's direct-examination testimony. The State's cross-examination, which followed immediately, was directed solely to the subject of
appellant's failure to talk to Detective Fitzgerald, with a substantial portion of the
State's questions focused on appellant's post-arrest silence.

Preservation of Error

 Appellant's trial counsel's repeated "Fifth Amendment" objections to
prosecutorial questions and jury argument about his post-arrest silence were sufficient
to alert the trial court that appellant was complaining of the violation of his post-arrest right to remain silent, as protected by Texas Constitution article I, section 10. 
Sanchez v. State, 797 S.W.2d 575, 582 (Tex. Crim. App. 1986) (holding "that a
defendant may not be impeached through the use of post- arrest, pre-Miranda silence
since such impeachment violates the defendant's right to be free from compelled self-incrimination.")

 The majority states that appellant did not preserve his first point of error for
review because he "invoked only the Fifth Amendment" and "failed to make an
objection at trial based on the Texas Constitution." As authority, the majority cites
Barnum v. State, 7 S.W.3d 782, 789-94 Tex. App.--Amarillo 1999, pet. ref'd) and
Cantu v. State, 994 S.W.2d 721, 732-33 (Tex. App.--Austin 1999), pet. dism'd,
improvidently granted, 19 S.W.3d 436 (Tex. Crim. App. 2000). In each case, the
court's holding that there was no preservation of error as to Texas constitutional
claims is dictum. Violation of the federal constitution's Sixth Amendment
Confrontation Clause was the basis for the rulings in both cases, not violation of state
constitutional rights against self incrimination.

 By contrast, other Texas appellate courts, dealing exclusively with the right to
remain silent after arrest, have held that neither invoking "only the Fifth
Amendment," nor failing to object at trial based on the Texas Constitution waived the
right to claim on appeal the violation of article I, section 10. Veteto v. State, 8 S.W.3d
805, 810 (Tex. App.--Waco, 2000, pet. ref'd) (holding objection stating "Fifth
Amendment right" grounds sufficient to preserve claim that prosecutor improperly
impeached defendant with his post-arrest silence); Cabrera v. State, 932 S.W.2d 653,
660 (Tex. App.--Houston [14th Dist.] 1996, no pet.) (holding no waiver of article I,
section 10 violation by failing to object at trial that prosecutor's jury argument
violated defendant's right against self-incrimination under Texas Constitution).

 How precise must an objection be to preserve a complaint of violation of a
defendant's post-arrest right to remain silent, when Texas law on the subject is clearly
settled? The State asserts in its brief that "the trial court could not possibly have
understood that the appellant was objecting to the use of post-arrest silence as a
violation of the Texas Constitution under Sanders (2) [sic]." (Emphasis added). Why
not? This argument assumes that a Texas trial court would be aware of the limited
federal constitutional right to post-arrest silence announced in Fletcher v. Weir (3)
(leaving to states to determine whether Fifth Amendment protects post-arrest, pre-Miranda silence), but unaware that our Texas Court of Criminal Appeals settled the
issue in 1986 in Sanchez by holding that article I, section 10 fully protects a
defendant's post-arrest, pre-Miranda silence.

 The pertinent words of the Fifth Amendment, "nor shall [any person] be
compelled in any criminal case to be a witness against himself," and article I, section
10, "[An accused] shall not be compelled to give evidence against himself," are so
nearly identical that a "Fifth Amendment"objection should certainly alert a trial court
that the constitutionally protected right to remain silent is being asserted. Article I,
section 10 is the Texas version of the Fifth Amendment right to remain silent. I
conclude that the error was preserved.

Point of Error One--Cross-Examination of Appellant About His Post-Arrest
Silence

 Appellant asserts in his first point of error that the trial court erred in overruling
his objection to the State's impeaching him on cross-examination about his post-arrest silence.

 The majority opinion's short summary of the State's cross-examination does
not convey the prosecutor's relentless pursuit of the subject of appellant's silence --
from permissible pre-arrest investigation well past the point where appellant's right
to post-arrest silence began.

 The prosecutor's first five questions on cross-examination of appellant dealt
with whether he was aware that Detective Fitzgerald was trying to contact him during
the investigation, and appellant's failure to meet or speak with him. Appellant
objected to the prosecutor's first question, citing the Fifth Amendment.

 Prosecutor: Mr. Heidelberg, you certainly knew that Detective
Fitzgerald was trying to get a hold of you [to] talk to
you, didn't you?

 

 Defense Counsel: Objection, Your Honor. This goes to the Fifth
Amendment right, my client's Fifth Amendment. He
doesn't have to talk to anybody.

 

 The Court: Be overruled.


 The trial court's ruling was correct; the prosecutor's question did not indicate
whether the time period inquired about was before or after appellant's arrest. A
defendant's "[p]re-arrest silence is a constitutionally permissible area of inquiry." 
Peters v. State, 997 S.W.2d 377, 388 (Tex. App.--Beaumont 1999, no pet.) (citing
Waldo v. State, 746 S.W.2d 750, 755 (Tex. Crim. App. 1988)).

 However, the cross-examination continued:

 Prosecutor: Answer the question. You certainly knew that
Detective Fitzgerald was trying to get ahold of you
to talk to you about this case?

 

 [Appellant]: No, I did not. I had gotten messages to call
someone, but it wasn't who; it was just a number.

 

 Prosecutor: Isn't it true on January 14th of this year you called
Detective Fitzgerald's office in response to an
attempt on his part to get ahold of you?

 

 [Appellant]: Yes, they had gave me the number which I didn't
know. And once I called, it was an answering
machine stating who it was so I had left a message,
you know.


 Prosecutor: So you certainly knew that Fitzgerald was trying to
talk with you about this case?

 

 [Appellant]: No, I didn't know it was about this case. I didn't
know what it was about.

 

 Prosecutor: Did you ever ask to talk to the detective about this
case once you knew that the charges were there?

 

 [Appellant]: I didn't know about any charges until July (4) of this
year. 

 

 Prosecutor: And in July of this year did you ask to talk to the
detective on the case?


 [Appellant]: Well, I was already incarcerated. So - -

 

 Prosecutor: Well, did you ever ask anyone - -

 

 Defense Counsel: Objection, Your Honor. This goes to the Fifth
Amendment.


 This objection, unlike appellant's earlier "Fifth Amendment" objection, was


clearly made in response to a post-arrest event.

 

 The Court: Overruled. Answer the question.

 

 [Appellant]: Did I ask to talk to a detective?

 

 Prosecutor: Yes, sir.

 

 [Appellant]: No.

 

 Prosecutor: Because you certainly - - you certainly could have
talked with the detective about all these horrible
things that [the complainant] has gone through that
have lead her to lie - - let me finish my question.

 

 [Appellant]: Sorry.

 

 Prosecutor: You certainly could have talked with the
investigating officer on this case and explained to
him, in your opinion, why [the complainant] made
this up; right?

 

 Defense Counsel: Objection, Your Honor. My client - - all of this line
of questioning goes to the Fifth Amendment. My
client does not have to speak with anyone about it.

 

 The Court: Be overruled.

 

 [Appellant]: Could you ask the question again, please?

 

 Prosecutor: You could have talked with the investigating officer
once you knew about the charges and explained to
him how this was a false allegation and why it was
a false allegation.

 

 [Appellant]: Well, when I knew about it, I didn't know that I had
to talk to any detective or anything about it. I did
request to see an attorney so I could tell them about
it, to tell someone. When I got arrested I told
whoever the detectives I talked to about it.

 

 Prosecutor: Did you ever make any attempt to talk to the
detective on this case to tell him your side?

 

 Defense Counsel: Objection, Your Honor. This is asked and answered.

 

 Prosecutor: I don't think he's answered it yet, Judge, or I
wouldn't keep asking.

 

 The Court: Be overruled. Answer the question.

 

 [Appellant]: When I was incarcerated, I did.

 

 Prosecutor: You did?

 

 [Appellant]: Yes.

 

 Prosecutor: Who did you talk to about it, which detective?

 

 [Appellant]: When I was going through - - well, I don't know if
they were a detective or not, but whoever was telling
me about it and they were asking me about it, I was
telling them. So I guess they were the ones who was
in charge or I don't know.

 

 Prosecutor: Did you ever say, "I want to talk to the detective that
handled this case?"

 

 [Appellant]: No, I did not.

 

 Prosecutor: Pass this witness, Your Honor.

(Emphasis added).

 I would hold that the error was preserved because the objection was sufficient
to alert the trial court that appellant was challenging the prosecutor's inquiry into his
constitutionally protected post-arrest silence.


Point of Error Two--the State's Rebuttal Evidence of Appellant's Post-Arrest
Silence

 Appellant asserts in his second point of error that the trial court erred in
permitting the prosecutor, over his objection, to elicit testimony from Detective
Fitzgerald about appellant's post-arrest silence. During rebuttal after the defense's
evidence, the prosecutor questioned Detective Fitzgerald as follows:

 Prosecutor: You told the jury that part of your procedure is to
make contact with a suspect to get their side of the
story?

 

 Witness: Yes, ma'am.

 

 Prosecutor: Did you attempt to do that in this case?

 

 Witness: Yes, ma'am. I did.

 

 Prosecutor: Were you able to make contact with the defendant?

 

 Witness: In a way.

 

 Defense Counsel: Objection, Your Honor. I would like to renew my
objection as to my client's Fifth Amendment right.

 

 The Court: Be overruled.

 

 Defense Counsel: May I have a standing objection throughout so I'm
not having to -

 

 The Court: You may.

 

 Defense Counsel: - keep getting up?

 

 Prosecutor: Did you make contact with him?

 

 Witness: In a manner of speaking, yes, ma'am.

 (Emphasis added)

 In the next eight questions and answers, the prosecutor developed Fitzgerald's
effort to contact appellant through messages and telephone numbers left with others,
and Fitzgerald's receipt of two telephone calls from appellant on an answering
machine. In the first call, on January 14, 2001, appellant "identified himself, didn't
leave a number and said 'I'll call you back later'" Appellant's second message to
Fitzgerald was on January 23, a Saturday, and Fitzgerald did not receive it until the
following Monday. Both were clearly pre-arrest calls, and appellant's objection was
properly overruled. Waldo, 746 S.W.2d at 755; Peters, 997 S.W.2d at 388 (holding
that questions about defendant's pre-arrest silence is admissible). However, the next
question and answer were:

 Prosecutor: Once the defendant was placed under arrest, had he
wanted to talk to you, would you have sat down and
spoken with him?

 

 Witness: Oh, definitely; yes, ma'am.

 Appellant's "standing objection" covered the prosecutor's post-arrest question
as well as the her earlier pre-arrest inquiries. I would hold that appellant's "Fifth
Amendment" objection was sufficient to apprise the trial court of appellant's
objection to Detective Fitzgerald's testimony about appellant's constitutionally
protected post-arrest silence. Veteto, 8 S.W.3d at 810-11. Thus, I would hold that
the trial court erred in allowing the question and answer.

Point of Error Four--Prosecutorial Comments in Final Argument about
Appellant's Post-Arrest Silence

 In point of error four, appellant asserts the trial court erred in overruling his
objection to the following State's rebuttal argument at the guilt/innocence stage.

 Prosecutor: Do you really believe he wanted to wait five months
from the date of arrest, he saved all that information
to come and tell you? Of course not, that's garbage.


 Defense Counsel: Your Honor, I object again. And may I have a
standing objection to any reference to the Fifth
Amendment?


 The Court: That will be overruled.


(Emphasis added).

 The prosecutor's comment clearly referred to appellant's post-arrest period. 
As in points of error one and two, appellant's "Fifth Amendment" objection was
sufficient to apprise the trial court of the objection to testimony about appellant's
constitutionally protected right to post-arrest silence. See Veteto, 8 S.W.3d at
810-11. I would therefore hold that the trial court erred in allowing the argument.

 Constitutional errors in jury argument, as well as in questions to witnesses,
require analysis under the Harris standard of constitutional error review. Thompson,
89 S.W.3d 843, 851-52 (Tex. App.--Houston [1st Dist. 2002, pet. ref'd) (holding
that prosecutor's closing remarks amounted to constitutional error and required Texas
Rule of Appellate Procedure 44.2(a) analysis applying Harris standard); see also
Orona v. State, 791 S.W.2d 125, 130 (Tex. Crim. App. 1990).

Were the Errors Harmless Beyond a Reasonable Doubt?

 Texas Rule of Appellate Procedure 44.2(a) mandates that we reverse
appellant's conviction unless we determine beyond a reasonable doubt that the errors
made no contribution to it. In assessing harm, we are required to examine the record
to consider: (1) the source of the error; (2) the nature of the error; (3) whether or to
what extent it was emphasized by the State; (4) its probable collateral implications;
(5) how much weight the jury would probably place on the error; and (6) whether
declaring the error harmless would encourage the State to repeat it with impunity. 
Harris, 790 S.W.2d at 587.

 The source of the error was the State, i.e., the prosecutor's repeated questions
about appellant's post-arrest silence. The trial court's rulings, overruling appellant's
objections, enhanced the error and placed the trial court's approval on it. See Godfrey
v. State, 859 S.W.2d 583, 585 (Tex. App.--Houston [14th Dist.], 1993, no pet.). Had
the trial court sustained appellant's objections and instructed the jury to disregard the
improper questions and argument, we would have to consider only whether the
potential prejudice was cured. Veteto, 8 S.W.3d at 811. I would hold that this first
factor favors a finding of harm.

 The nature of the errors in points one, two, and four were violations of
appellant's constitutional right against self-incrimination by infringement on his right
to post-arrest silence. The prosecutor's questions to appellant and Detective
Fitzgerald repeatedly elicited that, after his arrest, appellant never asked to speak to
the investigating detective, Fitzgerald, to give his version of the events of the case--a
position inconsistent with appellant's claim of innocence at trial. The prosecutor's
closing argument emphasized appellant's decision not to speak up and answer the
accusations. This factor also favors a finding of harm.

 The error was emphasized by the State. The prosecutor asked appellant
directly, at least twice, whether he ever tried to talk to Detective Fitzgerald about the
case after his arrest. She then asked Fitzgerald on rebuttal whether, once appellant
was placed under arrest, Fitzgerald would have sat down with appellant and spoken
with him. In closing argument, the prosecutor asked the jurors if they "really believed
[appellant] wanted to wait five months from the date of arrest" and "[saved] all that
information to come and tell you." The prosecutor's closing argument underscored
appellant's unwillingness to cooperate with the investigation after his arrest. I
conclude that the State emphasized the error, a third factor showing harm to appellant.

 The probable collateral implication of the errors was to diminish and offset
appellant's defensive theory that the offense did not occur, or that, if it did, he did not
commit the offense. Appellant's silence, both pre- and post-arrest, was the exclusive
topic of the prosecutor's short cross-examination of appellant. As trial strategy, the
prosecutor's questions on cross-examination undermined the strong protestations of
innocence with which appellant had concluded his direct examination testimony only
moments before. I would hold that this factor, too, harmed appellant.

 In evaluating the weight that jurors would probably place on the error, we must
acknowledge that

 [w]e do not know what might have gone through a juror's mind. It is
certainly conceivable that a juror thought [he or she] should know about
any post-arrest conversations or silence of [the defendant]. [The juror]
may have believed [the defendant] was trying to hide something and the
. . . prosecutor was doing everything he could to present it to [the juror].

Veteto, 8 S.W.3d at 813. Appellant's repeated objections to the improper post-arrest
inquiries may well have suggested that "he was trying to hide something from the
jury." Id. I believe that the weight jurors would place on the repeated error, both in
evidence and in argument, was harmful to appellant.

 The final Harris factor to consider is whether our declaring the error harmless
might encourage the State to repeat it with impunity. As in Mendoza, "we cannot
ignore the fact that the prohibition on commenting or inquiring into the post-arrest
silence of the accused has been settled law of the land for at least 20 years." Mendoza
v. State, 959 S.W.2d 321, 326 (Tex. App.--Waco 1997, pet. ref'd). The State's
repeating the constitutional error through the testimony of two witnesses, and
referring to it in closing argument, militates against the State on that factor. I
conclude that declaring the error harmless will encourage its repetition.

 In addition to its five-factor harm analysis, Harris further restates in a variety
of ways the concept whether error is harmless beyond a reasonable doubt. In
applying the harmless-error rule, our Court of Criminal Appeals instructs that we
must "focus not on the weight of the other evidence of guilt, but rather on whether
the error at issue might possibly have prejudiced the jurors' decision making." 
Harris, 790 S.W.2d at 587 (emphasis added). Can we say that "the nature of the error
is such that it could not have affected the jury"? Id. Could a rational trier of fact
"have reached a different result if the error and its effects had not resulted"? Id. at
588. I believe the answer to the last question is, unavoidably, "Yes."

 The essential issue in the case was, as the prosecutor argued, the credibility of
the complainant, on the one hand, and appellant on the other. As the prosecutor
stated in closing argument, "You have to decide, either [the complainant] is telling
the truth or the defendant is telling the truth. That's really all you have to decide,
everything else falls in line once you reach that decision."

 I would hold that the violation of appellant's rights under Texas Constitution
article I, section 10 by the prosecutor's questions directed to him and to Detective
Fitzgerald, combined with the prosecutor's comments in closing argument about
appellant's post-arrest silence, struck at appellant's credibility. I do not believe this
Court can say beyond a reasonable doubt that the errors could not have prejudiced the
jurors' decision making, or that without the errors and their effects, a rational fact
finder could not have reached a different result. Accordingly, I would sustain
appellant's points of error one, two, and four.

Conclusion


 I would hold that the motion for en banc consideration should be granted,
appellant's points of error one, two and four should be sustained, the judgment of
conviction should be reversed, and the cause remanded to the trial court.


 

Lee Duggan, Jr. (5)

Justice


Panel consists of Justices Taft, Brister, (6) and Duggan.

Appellant moved for rehearing and for en banc consideration on rehearing.

A majority of the justices of the Court voted to deny en banc consideration on
rehearing.


Justice Duggan dissenting from the judgment and dissenting to the denial of en banc
consideration on rehearing.

Publish. Tex. R. App. P. 47.2(b).
1. - " '
 " 
 ' 
 '
 
 " 
 " 
 '
 ' 
2. "" 
 "" 
 ' 
 ' 
 
 
3. 
4. ' " " 
 
 
 
 
5. 
 
6.